NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230327-U

NOS. 4-23-0327, 4-23-0328, 4-23-0329 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 8, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 19JA490 |
| v.    (No. 4-23-0327) | ) | |
| Tanya S., | ) | |
| Respondent-Appellant). | ) | |
| —————————————————————— | ) | |
| | ) | |
| *In re* A.W., a Minor | ) | No. 19JA491 |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-23-0328) | ) | |
| Tanya S., | ) | |
| Respondent-Appellant). | ) | |
| —————————————————————— | ) | |
| | ) | |
| *In re* C.N., a Minor | ) | No. 19JA492 |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.    (No. 4-23-0329) | ) | |
| Tanya S., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held:* The appellate court affirmed the judgment of the trial court terminating respondent's parental rights because the trial court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2    Respondent, Tanya S., is the mother of M.P. (born February 2019), A.W. (born May 2016), and C.N. (born January 2008). In April 2023, the trial court found respondent was an unfit parent under the Adoption Act (see 750 ILCS 50/1(D)(m)(i), (m)(ii) (West 2022)) and that termination of respondent's parental rights would be in the children's best interest.

¶ 3    Respondent appeals, arguing that the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                 I. BACKGROUND

¶ 5    We note that A.W.'s father, Matthew W., has filed a separate appeal. The facts pertaining to Matthew have little relevance to respondent's claims on appeal, and we make only passing reference to them.

¶ 6                              A. Procedural History

¶ 7    In November 2019, the State filed petitions for adjudication of wardship, alleging that M.P., A.W., and C.N. were neglected in that they lived in an environment that was injurious to their welfare—specifically, they "reside[d] in a home where domestic violence is engaged in, thereby placing the [them] at risk of harm" (see 705 ILCS 405/2-3(1)(b)) (West 2018)). Two weeks after the petitions' filing, the trial court conducted a shelter care hearing and placed temporary guardianship and custody of the minors with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 8    In August 2020, the trial court conducted an adjudicatory hearing. Respondent stipulated to the allegations in the petitions that the minors' environment was injurious due to domestic violence. She further stipulated that the DCFS statement of facts provided a factual basis

for the stipulation.

¶ 9      According to the statement, respondent and Timothy P. (M.P.'s father) got into an argument over a woman Timothy was involved with. Respondent went to lie next to M.P., and Timothy threw an ashtray towards them. She took M.P. into the kitchen and Timothy started " 'whacking' " her. He then hit her repeatedly and choked her. A.W. came into the kitchen while this was happening. Timothy hit respondent several times on the head with a gun and told her she was going to die. He then turned the gun towards himself and told her to pull the trigger.

¶ 10      Timothy started "throwing [respondent] around again," but she called the police. He kicked holes in the walls and wrote slurs, including "crack head" and "slut," on the walls. Timothy left the house before the police arrived, taking M.P. with him. He left her at the home of a relative. An investigator interviewed A.W. the next day. A.W. thought Timothy was going to kill respondent. He reported there had been "fighting" between the two in the past. Respondent was uncooperative with a request that she take a drug screening test and angry because she believed she was the victim in the situation. The court accepted respondent's stipulations to the neglect allegation and adjudicated M.P., A.W., and C.W. neglected minors.

¶ 11      In December 2020 and January 2021, the trial court conducted dispositional hearings. In February 2021, it entered an order finding respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline M.P., A.W., and C.N. The court also made the minors wards of the court and placed custody and guardianship of them with the guardianship administrator of DCFS. The court admonished respondent that she needed to cooperate with DCFS and complete services or she risked termination of her parental rights.

¶ 12      B. The Petition for Termination of Parental Rights

- 3 -

¶ 13      In December 2022, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent within the meaning of the Adoption Act due to her (1) failing to make reasonable efforts to correct the conditions that were the basis for the removal of the children from the parent during two nine-month periods following the adjudication of neglect—specifically, September 18, 2021, to June 28, 2022, and March 28, 2022, to December 28, 2022, and (2) failing to make reasonable progress toward the return of the children to the parent during three nine-month periods following the adjudication of neglect—specifically, February 19, 2021, to November 19, 2021, November 19, 2021, to August 19, 2022, and March 28, 2022, to December 28, 2022. See 750 ILCS 50/1(D)(m)(i), (ii) (West 2022).

¶ 14                    1. *The Fitness Portion of the Termination Proceedings*

¶ 15      In March 2023, the trial court conducted a hearing on the parental fitness portion of the termination proceedings. The State asked the court to take judicial notice of the neglect petitions, the temporary custody orders, the adjudicatory orders, the dispositional orders, and the five permanency review orders. No party objected, and the court took notice of the documents. The guardian *ad litem* (GAL) asked the court to take judicial notice of three documents from an order of protection in Winnebago County case No. 19-OP-2099: (1) "the meritorious defenses filed by [Timothy P.] on November 1st of 2019", (2) "the motion filed by [respondent] on January 2nd of 2020," and (3) a "motion to vacate that was filed [by respondent] on January 10th of 2020." The court agreed to take notice of these filings.

¶ 16                              a. Kala Davis

¶ 17      Kala Davis testified that she was a supervisor at Camelot Care Center (Camelot or the agency) and had supervised the cases of M.P., A.W., and C.N. Camelot received M.P.'s case in June 2021 and A.W.'s and C.N.'s cases in September 2022. The State, over respondent's

objection, used Davis's testimony to introduce the November 2019 integrated assessment of respondent. Also over respondent's objection, it introduced the five service plans dated May 2020, November 2020, May 2021, December 2021, and August 2022.

¶ 18 The service plans imposed requirements on respondent relating to "[s]ubstance abuse, domestic violence, mental health services, cooperation, housing, employment, psychological and psychiatry, and visitation."

¶ 19 Davis testified that at the beginning of the case, respondent was largely out of contact with the agency. However, after Jaimi Kitchen became the caseworker—in about August 2020—respondent was in frequent contact with Camelot. She called or texted "excessively" and was often argumentative, to the extent that the agency had to limit how often she could contact Kitchen.

¶ 20 Davis testified that Camelot had concerns about respondent's mental health based on its employees' observations and the diagnoses she received in a mental health assessment. Davis described conversations with respondent, stating that "conversations go from cool and collected to 10, very heated, very argumentative." Respondent would frequently deny having received information she had recently been given. (Respondent introduced the report from the mental health assessment that took place in November 2020. It indicated diagnoses of "Bipolar II Disorder, Severe," "Borderline Personality Disorder," and "Posttraumatic Stress Disorder.") The service plans required that respondent act on a recommendation for dialectical behavioral therapy (DBT). The plans also required that respondent have her medications—which were prescribed by her primary care doctor—reviewed by a psychiatrist. Davis testified that respondent participated in DBT for one month in early 2020 and did not satisfy the plan requirement.

¶ 21 The August 2022 plan required respondent to have a psychological assessment,

which respondent did not complete because she was argumentative with the assessor. Davis explained that respondent was unhappy because the referral document for the assessment contained inaccurate information. Davis conceded some information on the referral sheet was incorrect—for instance, a box for "LBGTQ" had been marked accidentally and "something *** about sexual assault" did not match any disclosure by respondent. Davis told respondent that the agency could not fix the referral sheet but offered to tell the person doing the assessment that the sheet contained errors.

¶ 22 Davis testified that, because of the incident that led to DCFS involvement, the agency had "domestic violence concerns regarding [respondent]." However, respondent was not referred to domestic violence services because she had been attending domestic violence programs at Remedies Renewing Lives in Rockford (Remedies) since 2018. She ceased attending such programs in spring 2021, when she moved to DeKalb and reported that she had successfully completed the program. According to Davis, Remedies programs were entirely voluntary and did not report successful completions.

¶ 23 The agency continued to have concerns relating to respondent's unwillingness to take responsibility for the children's presence during domestic violence. Davis noted that "at one point in time," respondent denied the incident that resulted in DCFS involvement had occurred. She also denied her sons' reports that that incident was not the first one, claiming that the agency had coached them to lie. Further, respondent claimed that Nicholas P. had held her captive in a basement for six weeks but did not report the incident to the police. Respondent was given a referral to a program akin to Remedies when she moved to DeKalb and was re-referred to Remedies when she returned to the Rockford area. She did not participate in any domestic violence programs after she ceased attending Remedies in 2021.

¶ 24        The agency had concerns that respondent was engaged in substance abuse. Respondent had a prescription for Adderall and a medical marijuana card. The agency was concerned that the two were incompatible. Respondent's drug tests were inconsistent as to the levels of Adderall and sometimes showed the presence of tetrahydrocannabinol but not Adderall. She tested positive for cocaine in November 2020, February 2021, and May 2021. Respondent missed 23 random drug tests over the life of the case.

¶ 25        Davis testified that respondent was referred to a dual mental health and substance abuse program at Remedies. She did not complete that program. She had a second substance abuse assessment in February 2022 that recommended no services. In August 2022, respondent was charged with a controlled substance offense, and the agency required respondent to have another substance abuse assessment. She declined.

¶ 26        Davis testified that Camelot did not have specific concerns about respondent's parenting skills. Davis had observed an unsupervised visit between respondent and her children, and respondent had "done fairly well." Of the visits supervised by Camelot, respondent attended 48 visits and missed 24 visits. She was late for 22 visits—sometimes as little as 5 minutes late, but sometimes as long as 50 minutes late. Davis believed that respondent's relatives had supervised some visits that had not been documented. She was aware that respondent regularly called C.N., who was living in Georgia with his paternal grandparents. Because respondent had not successfully completed any services, she had never qualified for unsupervised visitation.

¶ 27        Davis testified that respondent moved approximately 11 times over the course of the case. During 2020, she left for Indiana, Tennessee, and Florida; she returned to Illinois between stays in those states. Later, she lived in several towns in northern Illinois. The only time a caseworker had seen respondent's residence was in 2021. Davis implied that this was sometimes

because respondent refused to allow caseworkers to visit but noted that, when respondent lived in Elgin, she agreed to allow a visit, but because the agency did not complete background checks of respondent's housemates, it did not make a visit.

¶ 28　　　　The State asked Davis to summarize the agency's concerns about respondent's ability to parent safely. She explained:

> "Well, in August she was arrested for substance abuse [*sic*] on her way to a visit. And throughout the life the case, I know that reading reports from Jaimi Kitchen, when [respondent] was living in DeKalb there were several police activities, and the police activity had [respondent] involved with people that were using substance abuse or involved in domestic violence themselves. So she wasn't *** around appropriate people per those police reports. The constant moving, it would create a lack of instability [*sic*] for her children in general for education and everything else. Her mental health is a concern and getting that taken care of. Whether or not she is using her medications appropriately is a concern."

¶ 29　　　　On cross-examination, Davis agreed that respondent was participating weekly in services at Remedies from February 2021 to December 2021 and was reported to be benefiting from those services. Further, respondent had been using services at Remedies for some time before the case started. She agreed that it was plausible that respondent used services at Remedies at least 60 times in a period starting in 2020 and ending in May 2021. The services respondent used included DBT. Davis knew that respondent had discontinued DBT but did not know why.

¶ 30　　　　Davis testified that respondent had suggested that she felt overwhelmed by the required services. Also, Davis testified that, in September 2021, she, a supervisor, and the caseworker had met with her to explain each service and where she could receive the services.

¶ 31                           b. Respondent

¶ 32         Respondent testified that she had participated in substance abuse counseling "since 2019." She had a substance abuse assessment in August 2022 that concluded she was not in need of further substance-abuse-related services. She agreed that, in August or September 2022, she was arrested for, in her lawyer's words, "being in a car with somebody else." She pleaded guilty to the resulting charge. She felt that her arrest and guilty plea did not indicate that she needed more substance-abuse-related services: "I don't believe I had a substance abuse problem. I, unfortunately, was in the wrong company at the time, but I—they recommended—but I did not feel I needed the service—further substance abuse services, no."

¶ 33         Respondent had domestic violence counseling at Remedies between August 2020 and May 2021. She attended counseling sessions once or twice a week and completed about 60 sessions and had signed a release to allow the agency access to her records at Remedies. When she moved to DeKalb, she contacted her caseworker for reference to a service provider closer to her. She received a referral to Safe Passages, which she contacted. Safe Passages placed her on a waiting list. Because she "moved back home to help take care of [her] mother," she never went to Safe Passages.

¶ 34         Asked by counsel whether she felt she needed any more domestic violence services, she responded that, although she believed "counseling is always a good thing," she did not "have any domestic issues going on." Respondent elaborated that she had not been in a relationship for a long time and had not seen her abuser for years.

¶ 35         Respondent testified that in July 2022, the agency had requested that she have a psychological assessment, which she was willing to do. During the relevant period, she was representing herself in this case and received all case documents. One document had a box checked

for " 'Psychiatric Hospital Discharge Summary' " with a date of 2022. The document also stated she was known to have attempted suicide once and that she had reported a rape. Respondent e-mailed her caseworker to tell her the document contained false information. The caseworker told her the information would be changed, but it was not. She therefore was "uncomfortable" participating in the psychological assessment. On cross-examination, she agreed that the person doing the originally scheduled assessment did not complete the appointment. She agreed that she had questioned that person and asked her to look at documents. However, she denied that her questioning was hostile.

¶ 36 Respondent also testified that Dr. D'Souza with Remedies had consulted with respondent's primary care doctor and had no concerns about her medications. She stated that she had signed a release that allowed the agency access to this information, and she alerted the agency to Dr. D'Souza's consultation with her primary care doctor. She believed Dr. D'Souza's opinion resolved the concern over her medications.

¶ 37 Respondent started weekly individual counseling sessions with Susan Hoffstetter at Remedies in November or December 2020. These sessions continued until June 2021. She attended counseling sessions with Mary Earle at Remedies from January or February 2022 until January or February 2023, but Earle stopped working at Remedies. Counseling had helped respondent learn to "self-regulate."

¶ 38 Respondent testified that the agency mischaracterized her repeated moves. She had taken a job in Indiana but had not moved there. She did move to Tennessee in April 2020 because she could get work remodeling apartments and because her caseworker at the time, Charo Garlitz, told her that services were not available in Illinois at the time due to COVID-19. However, Garlitz told her that her case could not be transferred to Tennessee. Consequently, she came back to Illinois

in June 2020 and lived in her parents' house in Machesney Park.

¶ 39 Each time respondent moved, she informed Garlitz where she was living. However, she still could not get services or have physical visitations, so she moved to Florida to work as a handyman. She tried to initiate services in Brevard County, Florida. She gave the Brevard County Health Department Garlitz's phone number. When the health department told respondent it had been unable to reach Garlitz, respondent called Garlitz. Garlitz advised she had not missed any calls from the agency. Respondent decided to return to her parents' house to be present for her August court date. She had not left Illinois since then and had remained in the Rockford area until just before the termination hearing. She started domestic violence services at Remedies as soon as she returned to Illinois.

¶ 40 Respondent testified that she missed most of the 24 visitations to which Davis testified because she had difficulty with the confirmation process. Her testimony on this point is not clear, but it suggests either that respondent could not say 24 hours in advance whether she would be able to come or that she forgot that she had to confirm the visit 24 hours in advance. The only time she missed a visit she confirmed was when she ran out of gas on the way. She was occasionally a few minutes late because some of the placements required her to drive one and a half or two hours. When respondent visited her children, she always brought little gifts or food.

¶ 41                                  c. The Trial Court's Decision

¶ 42 In April 2023, the trial court conducted a hearing to issue its decision. It ruled the State had shown found by clear and convincing evidence that respondent was an unfit parent:

> "This matter really started in October of 2019 when an intact case was opened for this family. But due to [respondent's] failure to cooperate with the intact case or *** or preventing access [to the children], the matter was referred to the

- 11 -

state's attorney's office ***.

Now, [respondent] did engage in an integrated assessment and services were identified. They *** included *** substance abuse services, domestic violence services, mental health assessments and services, and *** psychiatric involvement for *** medication management.

Per the testimony, [respondent] was aware of what her services were. ***

In the final analysis, [respondent] failed to complete any service to the point of correcting conditions. At one point she was referred for DBT, *** which she engaged in for approximately a month. At one point she was referred to a psychological assessment. That assessment did not occur because of her issues with the referral document, which could have been corrected; and in the Court's eyes, this was essentially sabotaging that assessment.

Her efforts and progress were further undermined by her own relocations. Eleven moves over the life of the case, including to the states of Indiana, Tennessee, and Florida, which put her outside the jurisdiction of Illinois and made it far more difficult, if not impossible, to refer her to services.

As for substance abuse, she did not complete a substance abuse program. She did not demonstrate sobriety. She missed 23 drug tests. She had three test positive for cocaine and, finally, arrested in August of 2022 on drug charges. I believe those were in Boone County. And as a result of all this *** she never progressed even to unsupervised visits. Therefore, the State has proven by clear and convincing evidence [both] counts ***."

¶ 43        2. *The Best-Interest Portion of the Termination Proceedings*

¶ 44 On the same day it decided the parents' unfitness, the trial court conducted the best-interest hearing. The State reserved any evidence for rebuttal.

¶ 45 a. Respondent

¶ 46 Respondent introduced video and photographic evidence she used to show the quality of the interaction with her children. Respondent described her gift giving and her consistent recognition of the children's birthdays. She called C.N. daily. The GAL asked the trial court to allow the foster parents to address the court. M.P.'s foster mother told the court that M.P., then four years old, was thriving with her; she had ceased acting aggressively and had learned to read at a kindergarten level. She loved M.P. and could not "wait to see how she's going to change the world someday." A.W.'s foster mother stated that he and the foster family had "come a long way." She loved A.W. and was committed to making sure that he and M.P. remained family to one another.

¶ 47 b. The GAL

¶ 48 The GAL introduced photographs of the children with their foster families to support the position they were strongly bonded to those families.

¶ 49 c. The Trial Court's Decision

¶ 50 The trial court found the State had met its burden of showing it was in the children's best interest that the rights of all the parents be terminated. It noted that although the children had a loving relationship with respondent, they were also well-integrated into their foster families. It further pointed out that the case was three and a half years old and, under "the statute," "parents should have, within nine months, corrected the conditions that led to their [children's] removal." It further found that the probability that the children could be returned soon to respondent—the only parent who remained significantly involved with any of the

children—was slight.

¶ 51           This appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53           In this appeal, respondent argues that the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 54                          A. The Trial Court's Fitness Finding

¶ 55           Appellate courts can affirm the trial court's fitness determination on any ground that the trial court found respondent unfit. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 33, 195 N.E.3d 837. Accordingly, because we conclude that respondent failed to make reasonable progress towards the children's return during the nine-month period of March 28, 2022, to December 28, 2022, we address only that ground for unfitness.

¶ 56                 1. *The Applicable Law and the Standard of Review*

¶ 57                              a. The Standard of Review

¶ 58           A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48, 187 N.E.3d 763. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30, 125 N.E.3d 444.

¶ 59                          b. The Law Regarding Reasonable Progress

¶ 60        The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2022). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36, 157 N.E.3d 493 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)).

¶ 61        Similarly, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 62                               2. *This Case*

¶ 63        Here, the trial court found respondent unfit on all grounds alleged, which included failing to make reasonable progress from March 28, 2022, to December 28, 2022.

¶ 64        Respondent argues that the court's fitness finding was against the manifest weight of the evidence because the record shows respondent made reasonable progress during each period set out in the petition. First, she contends that because (1) the Remedies program she completed "was a dual program which included substance abuse and mental health counseling" and (2) the State presented no evidence that the Remedies program was insufficient to satisfy the requirements of her service plan, an unfitness finding based on a failure to adequately engage with those services is not supported by the record. Second, she argues that the last service plan, covering February 19, 2022, to August 19, 2022, is inconsistent with the State's claim of lack of progress from March 28, 2022, to December 28, 2022. She summarizes the plan as follows:

> "Exhibit 7 [the services plan filed with the court on August 31, 2022] included the following statements: [respondent] moved into an apartment in February, 2022; she was employed as of April, 2022; Remedies sent DCFS a letter that [respondent] 'understand the materials and has the skill[ ] to develop healthy relationships'; [respondent] had completed a second mental health assessment at Rosecrance on May 10, 2022, and a psychiatrist had reviewed her medications and had 'concerns' about the combination. That plan also stated that [respondent] provided a report from Remedies indicating that she had engaged in domestic violence therapy through individual therapy.
>
> The plan also stated that Mother was not involved in any violent incidents. It also stated that [respondent] was 'articulate' with the caseworker regarding what she had learned in domestic violence counseling. It also stated that [respondent]

meets with the agency virtually every week, and sometimes can't make drops at TASC because of her work schedule. The plan further noted that [respondent] was compliant with all court orders and completed a second substance abuse assessment at TASC, and was not recommended for further services. The plan also states that [respondent] completed a mental health assessment and engaged in individual therapy and DBT in May, 2022. It also noted that [respondent] refused a psychological evaluation because of the documentation DCFS had prepared for her referral. [Respondent's] concern[s] were false information in the referral, including claims of a sexual assault and a psychiatric hospitalization that never happened."

¶ 65    The core of respondent's argument is that the agency had no basis on which it could conclude that respondent had failed to make reasonable progress in any area of concern noted by Camelot—namely, its concerns about her mental health and substance use. However, respondent discounts the significance of (1) the conditions with which she was diagnosed, (2) the value of the caseworkers' observations, and (3) the significance of the required assessments.

¶ 66    Respondent's argument about the completeness of her therapies is a distraction from addressing whether the trial court erred in determining that respondent failed to make reasonable progress toward *the return of the children*. Certainly, *C.N.* recognizes the importance of a respondent's compliance with a service plan. See *C.N.*, 196 Ill. 2d at 216 (stating the measure of progress "*encompasses* the parent's compliance with the service plans and the court's directives" (emphasis added)). However, a court cannot appropriately reduce "reasonable progress" under section 1(D)(m)(ii) of the Adoption Act to a mere tally of sessions or classes a respondent has attended. *C.N.* stated that "the benchmark" for measuring reasonable progress "encompasses the parent's compliance with the service plans *** in light of the condition which

gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17. Accordingly, determining a respondent's progress cannot be simply a matter of considering what services a respondent has "completed." A court may reasonably give more weight to evidence that caseworkers have concerns that a respondent's mental health will prevent him or her from safely having custody of the child than to the number of therapy sessions a respondent has attended. Moreover, if caseworkers have concerns about a respondent's mental health or substance abuse despite his or her participation in services, an appropriate response is to require the respondent to undergo a new assessment.

¶ 67　　　　Here, in the period of March 28, 2022, to December 28, 2022, the caseworkers had sufficient concerns about respondent's mental health and substance abuse that they asked her to schedule both a psychological evaluation and a new substance abuse evaluation. As the copy of respondent's mental health evaluation shows, her diagnoses of "Bipolar II Disorder, Severe," "Borderline Personality Disorder," and "Posttraumatic Stress Disorder" provided a basis for those concerns that went beyond caseworkers' observation of respondent's behavior. The record shows that the agency had begun considering requiring respondent to undergo psychological evaluation no later than the March 2022 permanency review and that, at that review, the court explicitly recommended that respondent undergo a psychological evaluation. The agency recommended that respondent undergo a new substance abuse assessment after she was arrested in August or September 2022 for a controlled substance offense. (Respondent testified she entered a guilty plea to the offense.)

¶ 68　　　　Respondent did not complete either evaluation. She testified that her arrest was the result of "being in the wrong company," and therefore, she did not need a substance abuse

evaluation. She failed to complete a psychological evaluation because, at her original appointment, she argued with the evaluator about inaccuracies in the referral paperwork to the extent that the evaluator declined to complete the evaluation. Respondent failed to reschedule a second evaluation. The trial court, which had observed respondent in depth, particularly when she was representing herself, deemed that her reaction to the errors in the documents was "essentially sabotaging that assessment."

¶ 69      Accordingly, because the trial court's finding that respondent failed to make reasonable progress towards the return of the children during the period of March 28, 2022, to December 28, 2022, was not unreasonable, the court's finding respondent unfit was not against the manifest weight of the evidence.

¶ 70                    B. The Trial Court's Best-Interest Finding

¶ 71                    1. *The Applicable Law and the Standard of Review*

¶ 72      At the best-interest portion of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) [T]he child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with

parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953 (citing 705 ILCS 405/1-3(4.05) (West 2018)). However, the "trial court's best-interest determinations 'need not contain an *explicit* reference to each of [the statutory] factors, and we need not rely on any basis used by the trial court in affirming its decision.' " (Emphasis added.) *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 58, 179 N.E.3d 329 (quoting *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78, 44 N.E.3d 1144). Further, "[t]he court may also consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being." *Davon H.*, 2015 IL App (1st) 150926, ¶ 78.

¶ 73        A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 74                                    2. *This Case*

¶ 75        Respondent argues that the trial court's best-interest finding was against the manifest weight of the evidence because the State presented insufficient evidence to meet its burden to prove termination was in the children's best interests—specifically, respondent argues that the State did not meet its burden because the sole evidence regarding the children's best interest was the report by Camelot filed on April 5, 2023, which failed to (1) address the wishes

of the children, (2) consider the children's multiple placements, or (3) give any weight to the children's interest in living together as a family. We disagree.

¶ 76　　　　First, although respondent is correct that Camelot's report does not contain specific statements of the children's preferences for custody, the evidence generally showed that the children did not want to be removed from their placements. The report states that (1) A.W. and C.N. were each "content with residing with [their] current caregivers," (2) C.N. "expressed that he [was] happy," (3) A.W. "demonstrate[d] that he [was] happy to be with [his foster parents]," and (4) M.P. "demonstrate[d] that she [was] happy in her home." This evidence suggested that all three children preferred to remain in their placements. No evidence suggested that any of the children would prefer to return to respondent.

¶ 77　　　　Second, although respondent is correct that the report did not address the children's multiple placements, that absence does not weigh in favor of respondent. Comments in the record make clear that A.W. suffered because he had multiple placements. However, the foster parents with whom the children were placed when the termination hearing occurred had all agreed to provide permanent homes to the children. A decision against terminating respondent's rights could work only against permanent placements for the children.

¶ 78　　　　Lastly, we agree with respondent that the children's interest in living together as a family is something the trial court could consider in determining the children's best interest. However, in considering that factor, the court was not required to find that a return of all the children to respondent was in their best interest merely because portions of the Camelot report described how the children's placements helped the children to maintain contact with one another. Indeed, the record shows that Camelot had concerns about respondent's ability to have custody of the children in the near future.

¶ 79       For these reasons, we conclude that the trial court's best-interest determination was not against the manifest weight of the evidence. Accordingly, we affirm the court's judgment terminating respondent's parental rights.

¶ 80                                    III. CONCLUSION

¶ 81       For the reasons stated, we affirm the trial court's judgment.

¶ 82       Affirmed.