NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 230354-U

NO. 4-23-0354

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 18, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re A.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 19JA491 |
| v. | ) | |
| Matthew W., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held:*    Pursuant to *Anders v. California*, 386 U.S. 738 (1967), the appellate court granted counsel's motion to withdraw because no meritorious issues could be raised on appeal.

¶ 2    Respondent, Matthew W., is the father of A.W. (born May 2016). In April 2023, the trial court found respondent was an unfit parent under the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) and that termination of respondent's parental rights was in A.W.'s best interest.

¶ 3    Respondent appealed the trial court's order terminating his parental rights, and respondent's counsel on appeal has now moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). See *In re S.M.*, 314 Ill. App. 3d 682, 685-86, 732 N.E.2d 140, 143 (2000) (holding *Anders* applies to termination of parental rights cases and providing the proper procedure to be followed by appellate counsel). In his brief, appellate counsel contends that appeal of this case presents no potentially meritorious issues for review. We agree. Accordingly, we grant appellate

counsel's motion to withdraw and affirm the trial court's judgment.

¶ 4                                   I. BACKGROUND

¶ 5            We note that A.W.'s mother, Tanya S., has filed a separate appeal. We affirmed the termination of her parental rights in *In re M.P.*, No. 2023 IL App (4th) 230327-U. We address the facts relating to Tanya only to the extent they are relevant here.

¶ 6                               A. Procedural History

¶ 7            In November 2019, the State filed petitions for adjudication of wardship, alleging that A.W. was neglected because he lived in an environment that was injurious to his welfare in that he "reside[d] in a home where domestic violence is engaged in, thereby placing [him] at risk of harm" (705 ILCS 405/2-3(1)(b) (West 2018)). The State filed similar petitions regarding A.W.'s younger half-sister, M.P., and his older half-brother, C.N.; those petitions are not at issue in this appeal. Respondent appeared at the December 2019 arraignment, and the trial court appointed counsel for him. Two weeks after the petition's filing, the court conducted a shelter care hearing and placed temporary guardianship and custody of A.W. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 8            In August 2020, the trial court adjudicated A.W. and his half-siblings neglected minors.

¶ 9            Respondent was not present at the hearing. Tanya S., the mother of A.W. and his half-siblings, stipulated to the sole count in the three petitions—that the environment of the minors, including A.W., was injurious due to domestic violence. She further stipulated that the DCFS statement of facts provided a factual basis for the stipulation. Counsel for respondent was silent concerning the stipulation; Timothy P., the father of M.P., had no objection to the stipulation.

¶ 10           According to the DCFS statement, Tanya and Timothy had an argument over a

woman with whom Timothy was involved. Tanya then went to lie down next to M.P., and Timothy threw an ash tray toward the two of them. Tanya took M.P. into the kitchen; Timothy started " 'whacking' " Tanya. He then hit her repeatedly and choked her. A.W. came into the kitchen while this was happening. Timothy hit Tanya several times on the head with a gun and told her she was going to die. He then turned the gun toward himself and told Tanya to pull the trigger. He started "throwing her around again," but she called the police. He kicked holes in the walls and wrote slurs, including "crack head" and "slut," on the walls. Timothy left the house before the police arrived, taking M.P. with him. He left M.P. at the home of a relative. An investigator interviewed A.W. the next day. He said he thought Timonthy was going to kill Tanya. He said there had been "fighting" between the two in the past. Tanya was uncooperative with a request that she take a drug screening test and angry because she believed she was the victim in the situation.

¶ 11        In December 2020 and January 2021, the trial court conducted dispositional hearings. In February 2021, it entered an order finding respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline A.W. The court also made A.W. a ward of the court and placed his custody and guardianship with the guardianship administrator of DCFS. The court admonished the parties present that they needed to cooperate with DCFS and complete services or risk termination of their parental rights.

¶ 12                B. The Petition for Termination of Parental Rights

¶ 13        In December 2022, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent within the meaning of the Adoption Act due to his (1) failure to make reasonable efforts to correct the conditions that were the basis for the removal of A.W. from "the parent" during three nine-month periods following the adjudication of

neglect—specifically, February 19, 2021, to November 19, 2021; November 19, 2021, to August 19, 2022; and March 28, 2022, to December 28, 2022; (2) failure to make reasonable progress toward the return of the child to the parent during same three nine-month periods following the adjudication of neglect, and (3) failure to maintain a reasonable degree of interest, concern, or responsibility as to A.W.'s welfare. See 750 ILCS 50/1(D)(b), (m)(i),(ii) (West 2022).

¶ 14 1. *The Fitness Portion of the Termination Proceedings*

¶ 15 In March 2023, the trial court conducted a hearing on the parental fitness portion of the termination proceedings. Respondent was present. The State asked the court to take judicial notice of the neglect petitions, the temporary custody orders, the adjudicatory orders, the dispositional orders, and the five permanency review orders. No party objected, and the court took judicial notice of the documents. The guardian *ad litem* (GAL) asked the court to take judicial notice of three documents from a Winnebago County order of protection case, No. 19-OP-2099, which are not relevant to respondent's appeal.

¶ 16 a. The State's Evidence

¶ 17 Kala Davis testified that she was a supervisor at Camelot Care Center (Camelot or the agency) and had supervised the cases of A.W. and his half-siblings. Camelot received M.P.'s case in June 2021 and the cases of A.W. and C.N. in September 2022.

¶ 18 Davis testified about the purpose of a service plan:

> "So[,] a service plan is a plan that we create for the families based off of recommendations from the [integrated assessment], or if a service provider makes a recommendation, or if we have a concern, then we will create tasks with the recommendation. So, it basically tells the family what they need to do in order to get their children back. It also tells foster parents things we expect from them, same

with the youth."

She agreed when the State asked, "Do you maintain all of those service plans as part of your regular course of business?"

¶ 19　　　　The State used Davis's testimony to introduce respondent's integrated assessments. After Davis agreed that the exhibits offered by the State were true and correct copies of the service plans dated May 2020, November 2020, May 2021, December 2021, and August 2022, the State moved for the plans' admission. Respondent objected, but the trial court admitted them, ruling that a "proper foundation had been laid."

¶ 20　　　　Respondent did not participate in the original integrated assessment. The plan created after respondent had an integrated assessment in November 2022 recommended "[s]ubstance abuse, domestic violence, cooperation, visitation, [and] parenting" as services. Because the agency created this plan after the goal was no longer "return home," it would not include a recommendation for mental health services.

¶ 21　　　　Respondent had some contact with the agency in December 2019. Davis testified the case notes showed that the first caseworker, Charo Garlitz, did an integrated assessment of respondent, but her notes did not contain any recommendations for him. Under cross-examination by respondent's counsel, Davis agreed that the lack of recommendations was inconsistent with agency procedure. Jaimi Kitchen, the caseworker who succeeded Garlitz, testified that she was not aware that respondent had completed an integrated assessment.

¶ 22　　　　The first plan—that of May 2020—listed cooperation with the agency as a requirement for respondent and "substance abuse" as a service for him. On cross-examination, Davis said the plan also included domestic violence services.

¶ 23　　　　Davis testified that, starting in 2020, respondent was out of contact with the agency

for long periods:

> "So[,] I believe after [some] January 2020 visits [with A.W.], [respondent] sporadically had some contact in 2020, and even attended [a case review meeting], and then in December of 2020, he kind of stopped with the communication, and then it started back up again in *** November of 2022. He had attended court and [another agency employee] and I completed an [integrated assessment] with them. He had told [the other employee] that he hasn't been cooperating with services because [Tanya] had told him that she was getting the kids back, and that he didn't need to."

On cross-examination, Davis said that the agency had made 11 or 13 attempts to contact respondent between December 2020 and November 2022. After a contact from a new caseworker in November 2022, respondent participated in a new integrated assessment.

¶ 24 Davis testified that the agency did not have any concerns about respondent's mental health. It had concerns about his potential for domestic violence "due to his criminal history." Because he was not cooperating, no domestic violence services were recommended.

¶ 25 The plan included substance abuse services for respondent, but Davis testified she did not know the reason for the recommendation. Camelot did not seek to have respondent take random drug tests, nor did it offer him a referral for any substance abuse services. Davis had received information suggesting respondent had completed substance abuse services on his own, but she did not have any documentation of the completion. On cross-examination, she explained that, at the second integrated assessment, respondent said he had been participating in services. However, she said respondent claimed to have completed the services in 2021. (This claim was contrary to the testimony of Andrew Ryan Phillips, respondent's therapist, who testified on

respondent's behalf during a break in Davis's testimony. Phillips stated that respondent had completed intensive outpatient services but continued to receive outpatient services, albeit at the "lowest level of care.") Under cross-examination by another party, Davis stated that respondent had not disclosed he was on probation.

¶ 26    The agency had concerns about respondent's ability to parent A.W.:

"[T]hroughout the life of this case[, A.W.] is specialized [*sic*] because he has had some trauma. Trauma from coming into care, trauma from some of the foster homes that he has been in, and he has been in therapy in the past due to his behaviors, and those behaviors require some training. Our fosters parents are specialized, and they go through special training to be able to handle some of the children's behaviors, and [A.W.'s] foster parent participated in therapy with [A.W.] so that he didn't have some of the explosions and things, issues that he has, so in order for any parent to be able to parent [A.W.] appropriately, they would have to have some type of training in order to deal with some of the trauma that he has dealt with."

Because respondent was not cooperative, the agency never referred respondent to parenting classes.

¶ 27    Davis said that Kitchen had talked with respondent about his visitation rights in December 2020. Respondent was permitted weekly visitation but made only one visit, which took place in December 2020. Further, respondent never gave A.W. presents. When the trial court changed the goal from "return home," the agency ended respondent's opportunity for visitation.

¶ 28    b. Respondent's Evidence

¶ 29    Respondent, in his case-in-chief, asked the trial court to take judicial notice of (1) a November 2019 summons served on him, (2) a December 2019 continuance order, (3) "the

- 7 -

YSB [(Youth Service Bureau)] report filed in this case on January 30, 2020," (4) a November 2022 continuance order, and (5) the Camelot report filed March 2, 2023.

¶ 30                                    i. *Andrew Ryan Phillips*

¶ 31          Andrew Ryan Phillips, called by respondent, testified that he had a master's degree in social work and was employed as a case therapist by the Northwestern Medicine Ben Gordon Center (Ben Gordon Center) in DeKalb, Illinois. His work related to addiction and mental health. He stated he was "trained in dialectical behavioral therapy [(DBT)], cognitive behavioral therapy, [and] medication management and monitoring." He explained, "A lot of the work has to do with training mental health and comorbidity, which is both addiction and mental health components."

¶ 32          Phillips testified that respondent had been receiving services at the Ben Gordon Center as part of a "treatment court program." Respondent never submitted release forms to allow the Ben Gordon Center to share his treatment information with any entity involved in the juvenile case.

¶ 33          Phillips testified that respondent was diagnosed with cocaine use disorder and an unspecified stimulant use disorder. Regarding the services respondent received, he stated, "Standard intensive outpatient, which means he would have engaged in weekly services anywhere from 9 to 19 hours per week." Once those services were completed, respondent would have been lowered to 1.0 outpatient service, which is "our lowest level of care that we offer here." Phillips stated that respondent completed intensive outpatient therapy in February 2022. Phillips further testified that "[respondent] would have engaged in dialectical behavior therapy, addiction 101, cognitive behavioral therapy which would have been known as our New Direction Group which focuses on criminal addictive patterns, and our Thursday night relationship group." Phillips learned from respondent's probation officer that respondent had "submitted to 75 negative drug

screens" and was sober since April 26, 2022.

¶ 34                                      ii. *Respondent*

¶ 35        Respondent testified that, at the start of the case, A.W. was placed with Tanya's cousin. He visited A.W. "[n]umerous times" while A.W. was in that placement. A.W. came to his house for Christmas in 2019. Counsel asked respondent when was "the last time" he told a caseworker that he wanted to visit A.W. Respondent said he did so in December 2022 or January 2023, but the caseworker told him that a visit would be inappropriate. He ceased receiving information about A.W. when A.W. stopped living with Tanya's cousin. Concerning A.W.'s subsequent care, respondent agreed that "it [was his] understanding that [A.W.] was safe and relatively well cared for at the time."

¶ 36        Respondent participated in the integrated assessment in January 2020 but then heard nothing from the caseworker or her agency. Respondent participated in an administrative case review in December 2020. He did not receive any advice about how to proceed in his case. After appearing at a court date in January 2020, the only communication respondent received from Camelot was in September or October 2022, relating solely to paternity.

¶ 37        On cross-examination, respondent said he did not receive a copy of the service plan and was not aware it had included recommended services for him. Respondent did not try to contact the agency. He explained, "the caseworker told me I wasn't going to be eligible to get my son because I had open cases." He admitted he had not consulted his attorney on the issue.

¶ 38        On cross-examination by another party, he said he did not recall contacts from caseworkers or speaking to Kitchen. He agreed that the agency had his proper street address but asserted that he had never used that address as his mailing address. (On redirect examination, he explained that he had given the agency his proper mailing address and had received

correspondence about the case at that address, but did not receive any mail at his street address.) He admitted that he had misstated his sobriety date when speaking to a caseworker in November 2022.

¶ 39    Beginning in May 2021, respondent was required to receive services as a part of his plea of guilty to a charge of aggravated battery in De Kalb County. He had informed Kitchen of his May 2020 arrest. He had completed many, but not all, of the required services and was progressing toward completing the remaining services on schedule. He found the services had helped him with "being mindful of others" and "emotional regulation." DBT had helped him learn more about himself.

¶ 40    Respondent had never previously interacted with DCFS. He had two daughters, aged 17 and 15, who lived with him. Respondent testified that he was then employed in a manufacturing job at H.A. Phillips and that he had been employed "for the most part" throughout the case at "a couple different places."

¶ 41                    c. The Trial Court's Decision

¶ 42    In April 2023, the trial court conducted a hearing to issue its ruling. It ruled the State had shown by clear and convincing evidence that respondent was an unfit parent, stating as follows:

          "Now, [in contrast to Timothy P., respondent] did participate in an integrated assessment on November 17, 2022. This is documented in [one of the State's exhibits], and it was testified to as well. *** [However, respondent] had little or no contact with the agency after that, so he completed no services.

          Because [respondent] did participate in the integrated assessment, the agency was able to assess what services were necessary: substance abuse services,

- 10 -

domestic violence services, parenting education, and visitation. As stated, he did not follow through with any of these services, and his contact with the agency was so sporadic that he could not even be referred to some of the services.

[Respondent] also barely visited, went missing in action several times that resulted in the agency having to issue diligent searches in search of him in attempt to locate him. Given this history over the life of the case and his noninvolvement, the State has proven all counts against [respondent] by clear and convincing evidence."

The court also found that the State had shown that Tanya was unfit because she failed to make reasonable efforts to correct the conditions that were the basis for the removal of her children during two nine-month periods and failed to make reasonable progress toward the return of her children during three nine-month periods. See 750 ILCS 50/1(D)(m)(i), (ii) (West 2022).

¶ 43          2. *The Best Interest Portion of the Termination Proceedings*

¶ 44          On the same day it decided the parents' unfitness, the trial court conducted the best interest hearing. The State asked the court to take judicial notice of the fitness proceedings and the report by Camelot, filed April 5, 2023, that addressed the best interest factors; the court did so. The State reserved any testimony for rebuttal. Respondent did not introduce any evidence. Tanya and the GAL introduced evidence to show, respectively, A.W.'s bond with Tanya and his bond with his foster family.

¶ 45          a. Camelot's Report of April 5, 2023

¶ 46          Camelot's report, filed on April 5, 2023, addressed the status of A.W. and his half-siblings in their placements. A.W. had been in foster care for approximately three years and four months. Davis testified in the fitness proceedings that his placement as of the hearing was

"specialized" because the foster parents had training in addressing A.W.'s trauma related to his removal and prior placements. However, as of the time of the report, A.W. had been discharged from therapy and his problematic behaviors were "minimal." He had a close bond with his foster parents, was "unconditionally loved," and he and his foster parents displayed "sincere affection for one another." The foster parents were willing to adopt A.W. The report did not state A.W.'s explicit wishes regarding custody. However, it stated that he "demonstrate[d] that he [was] happy to be with [his foster parents]" and was "content with residing with [them]." His foster parents helped him maintain contact with his half-siblings. Further, they were effective advocates for him.

¶ 47                     b. The Trial Court's Ruling

¶ 48          The trial court found the State had met its burden of showing it was in A.W.'s best interest that the rights of respondent and Tanya S. be terminated. It found that, although all the minors "clearly h[ad] a relationship with their biological mother," their relationships with the fathers were "not so much given the evidence that we heard." It noted that A.W. was well integrated into his foster family. It further pointed out that the case was three and a half years old; it stated that, under "the statute," "parents should have, within nine months, corrected the conditions that led to their [children's] removal." It further found that the probability that the children could be returned soon to Tanya—the parent it recognized as having a continuing relationship with the children—was slight.

¶ 49          3. *Respondent's Appeal and the Motion To Withdraw*

¶ 50          In April 2023, respondent filed a notice of appeal, and the trial court appointed counsel to represent respondent on appeal. In June 2023, appellate counsel filed a motion to withdraw and served a copy on respondent. This court notified respondent that he had until July 20, 2023, to file a response to the motion. That date has passed, and respondent did not file a

response.

¶ 51                                    II. ANALYSIS

¶ 52        Appellate counsel argues that the appeal of this case presents no potentially meritorious issues for review. Because we agree with appellate counsel, we grant his motion to withdraw and affirm the trial court's judgment.

¶ 53                          A. The Trial Court's Fitness Finding

¶ 54        A reviewing court should affirm a trial court's finding of unfitness if any ground on which the court found the respondent unfit is sustainable. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 33, 195 N.E.3d 837. Accordingly, an argument that the court erred in finding a respondent unfit is nonfrivolous *only* if it includes a nonfrivolous argument that the court erred in finding unfitness as to *every* ground on which it found unfitness. See *In re D.C.*, 209 Ill. 2d 287, 296, 807 N.E.2d 472, 476-77 (2004).

¶ 55                    1. *The Applicable Law and the Standard of Review*

¶ 56                          a. The Standard of Review

¶ 57        A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48, 187 N.E.3d 763. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30, 125 N.E.3d 444.

¶ 58        b.  The Law Regarding Failure To Maintain Reasonable Interest

¶ 59        A trial court may find a parent unfit under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022) if adequate evidence exists the parent failed to "maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." The analysis under section 1(D)(b) "does not focus on the parent's success, but rather the reasonableness of [his or] her efforts while considering her individual difficulties and circumstances." *In re Y.F.*, 2023 IL App (1st) 221216, ¶ 35.

¶ 60        The supreme court held the following in *M.I.*:

> " 'Circumstances that warrant consideration when deciding whether a parent's failure to personally visit his or her child establishes a lack of reasonable interest, concern or responsibility as to the child's welfare include the parent's difficulty in obtaining transportation to the child's residence [citations], the parent's poverty [citation], the actions and statements of others that hinder or discourage visitation [citation], and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child [citation]. If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances. [Citations.]' " *M.I.*, 2016 IL 120232, ¶ 28 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 278-79, 562 N.E.2d 174, 185 (1990)).

"[F]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare includes all situations when a parent's attempts are inadequate, 'regardless of whether that

inadequacy seems to stem from an unwillingness or an inability to comply.' " *Y.F.*, 2023 IL App (1st) 221216, ¶ 45 (quoting *M.I.*, 2016 IL 120232, ¶ 26). A respondent who regularly misses visitations demonstrates a lack of interest in the child's welfare unless he or she has a "valid excuse" for those absences. *M.I.*, 2016 IL 120232, ¶¶ 29-31.

¶ 61                                     2. *This Case*

¶ 62            Here, the trial court found respondent unfit on all grounds alleged, including his failure to maintain a reasonable degree of interest, concern, or responsibility as to A.W.'s welfare. Appellate counsel argues, among other things, that respondent's admitted failure to visit A.W. after the initial stages of the case and his lack of any excuse for his failure to visit A.W. preclude any nonfrivolous argument that the court erred in finding respondent unfit on this basis. We agree.

¶ 63            The record shows that this case was in the trial court for at least two and a half years and respondent had no contact with the agency between December 2020 and November 2022. Respondent testified that he had requested visits with his son during that time but was denied those visits. However, despite being represented by an attorney, he did not reach out to his attorney regarding those alleged denials. Further, respondent testified that once A.W. was removed from the placement with Tanya's cousin, he had no contact with A.W. and obtained no direct information about A.W.'s well-being—that change in placement occurred in October 2020. According to Davis's testimony, respondent did not provide any food or gifts throughout the case and never attended any doctor's visits for A.W.

¶ 64            Importantly, respondent did not provide a "valid excuse" for his failure to visit A.W. or remain active in A.W.'s life. See *id.* ¶ 29. Respondent testified that he was then employed in a manufacturing job at H.A. Phillips and that he had been employed "for the most part" throughout the case at "a couple different places." This regular employment implies that, although

respondent was eligible for appointed counsel, he was neither penniless nor had disabilities of the sort that would cause him to have unusual difficulty traveling to see A.W.

¶ 65 Further, respondent's own testimony indicates he took essentially no interest in A.W.'s well-being after A.W. left the care of Tanya's cousin. Respondent agreed that "it [was his] understanding that [A.W.] was safe and relatively well cared for" after A.W. ceased living with the cousin. However, he said he did not receive any "updates" about A.W. in that later phase of the case. Thus, the clear implication is that respondent never contacted anyone who could tell him directly about A.W.'s well-being. He reestablished contact with the agency only in late 2022, two years after A.W. was removed from the care of Tanya's cousin and just days before the change of goals.

¶ 66 Because respondent's testimony shows that he both failed to show interest in A.W.'s well-being and, without a valid excuse, failed to visit A.W. during most of the case, we agree that any argument that the trial court erred by finding respondent unfit would be frivolous.

¶ 67 B. The Trial Court's Best Interest Finding

¶ 68 1. *The Applicable Law and the Standard of Review*

¶ 69 At the best interest portion of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) [T]he child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity

- 16 -

of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953 (citing 705 ILCS 405/1-3(4.05) (West 2018)).

However, the "trial court's best-interest determinations 'need not contain an *explicit* reference to each of [the statutory] factors, and we need not rely on any basis used by the trial court in affirming its decision.' " (Emphasis added.) *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 58, 179 N.E.3d 329 (quoting *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78, 44 N.E.3d 1144). Further, "[t]he court may also consider the nature and length of the child's relationship with [his or] her present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being." *Davon H.*, 2015 IL App (1st) 150926, ¶ 78.

¶ 70        At the best interest hearing, although parents retain an "interest in maintaining the parent-child relationship, the force of that interest is lessened by the [trial] court's finding that the parent is unfit to raise his or her child." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Once the State has met its burden of showing unfitness, "the child's interest in a loving, stable and safe home environment" diverges from the interest he or she shares with the parent in avoiding an improper termination of the parent-child relationship and "become[s] more aligned with the State's interest in terminating parental rights and freeing the child for adoption." *Id.*

¶ 71        A reviewing court affords great deference to a trial court's best interest finding because the trial court is in a superior position to view the witnesses and judge their credibility.

*C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 72                                                    2. *This Case*

¶ 73          Counsel explains that there can be no arguable merit to any claim that the trial court erred by finding termination of the parents' rights was in A.W.'s best interest. We agree.

¶ 74          The record shows that since A.W.'s placement in March 2021, he was stable, had his needs met by his foster parents, and was very attached to them. The foster parents demonstrated a sincere attachment to A.W., encouraged him to visit his half-siblings, spoke positively about his parents, supported his participation in extracurricular activities, and wanted to adopt him. Ultimately, the record shows that A.W. was content and thriving in a placement that had lasted two years, free from the trauma that prior disruptions to his placements had caused. Accordingly, any argument that A.W.'s best interest would be served by anything other than permanency in his current placement would be frivolous.

¶ 75                                                    III. CONCLUSION

¶ 76          For the reasons stated, we agree with appellate counsel that no meritorious issues can be raised on appeal. We therefore grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 77          Affirmed.